UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PLASMA-THERM, LLC,

    Plaintiff,

v.                                                             Case No: 8:15-cv-2785-T-36TBM

MICRO PROCESSING TECHNOLOGY,
INC.,

    Defendant.
_____/

## **O R D E R**

This cause comes before the Court upon the claim construction briefs submitted by Plaintiff Plasma-Therm, LLC ("PT") and Defendant Micro Processing Technology, Inc. ("MPT")(Docs. 56, 57). Each party responded in opposition to the other's opening brief (Docs. 69, 70). On December 21, 2016, the Court held a claim construction hearing (Doc. 78). After reviewing the parties' submissions and hearing arguments of counsel, and being fully advised in the premises, the Court now construes the disputed claim terms as set forth herein.

**I.    BACKGROUND**

This is an action arising under the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, and the patent laws of the United States, 35 U.S.C. §§1 *et seq*. Plaintiff seeks a declaratory judgment of non-infringement of three patents. Doc. 40 ¶1. The three patents concern: United States Patent No. 8,906,745 ("the '745 patent"), United States Patent No. 8,450,188 ("the '188 patent"), and United States Patent No. 9,153,493 ("the '493 patent) (collectively, "the patents-in-suit") (Doc. 40 Exs. A, B, and C). The patents-in-suit generally relate to processing of semiconductor devices where, as part of the fabrication process, a semiconductor wafer is mounted on a metal base layer or back metal. They describe several methods of breaking or cutting the back metal layer to

complete the singulation of the individual devices. The '745 patent, entitled "Method Using Fluid Pressure To Remove Back Metal From Semiconductor Wafer Scribe Sheets," generally relates to breaking the back metal layer using a pressurized liquid. The '188 patent, entitled "Method Of Removing Back Metal From An Etched Semiconductor Scribe Street," generally relates to cutting the back metal layer using a cutting tool. The '493 patent, entitled "System For Separating Devices From A Semiconductor Wafer," generally relates to breaking the back metal layer by applying pressure with a stylus.

As alleged in the Amended Complaint: PT is in the business of manufacturing etching and thin film deposition equipment for the semiconductor industry. Doc. 40 ¶11. PT has developed and patented the use of plasma dicing to singulate devices on a semiconductor wafer. *Id.* PT has also developed and patented methods for separating the back metal layer on a semiconductor substrate to complete the singulation of devices on a semiconductor wafer that has a back metal layer. *Id*. MPT is in the business of manufacturing systems for the semiconductor industry. *Id*. ¶12.

The '745 patent application was filed on May 9, 2014, and "relates to a method to effectively separate the back metal layers in the semiconductor wafer scribe streets from the individual die that does indeed use a pressurized fluid." *Id*. ¶31 and Ex. C col. 2:34-37. The '188 patent application was filed on August 2, 2011, and relates to a method of removing back metal that includes "cutting the semiconductor material layer along scribe streets without cutting the metal layer, turning over the wafer, and cutting the metal layer along the scribe streets." *Id*. ¶39 and Ex. B; Abstract p. 2. The '493 patent was filed on January 16, 2013, and relates to a method of separating semiconductor devices of a semiconductor wafer including back metal on the back side thereof positioned on a plastic film. *Id.* ¶40 and Ex. A col. 2:57-59.

MPT has asserted that PT infringes independent claims 1 and 19[1] of the '745 patent. Claim 1 provides (emphasis added):

> A method of dividing a semiconductor wafer having a first wafer side including a semiconductor material layer, a second wafer side including a metal layer, and etched scribe streets extending from said first wafer side through said semiconductor material layer to said metal layer between semi-conductor material dies, said method comprising the steps of:
> placing a sheet of deformable material into engagement with the second wafer side to cover said second wafer side;
> positioning said semiconductor wafer with the first wafer side thereof in engagement with a support surface;
> employing said support surface to support said semiconductor wafer; and
> while said sheet of deformable sheet material is in engagement with said second wafer side, carrying out the step of **pressurizing fluid contacting** said sheet of deformable material to deform the sheet of deformable material and cause the metal layer to break at the locations of the scribe streets.

MPT has asserted that PT infringes independent claims 1, 16, and 17 of the '188 patent. Representative claim 1 provides (emphasis added):

> A method of dividing a semiconductor wafer having a metal layer attached to a semiconductor material layer and intersecting scribe streets into separate individual devices, said method comprising the steps of:
> mounting the wafer on a first support with the metal layer adhesively attached to said first support whereby said first support supports said wafer;
> while said metal layer is adhesively attached to said first support, removing substantially all the semiconductor material in the scribe streets to form individual semiconductor material dies, each incorporating a device, without removing the metal layer from the scribe streets;
> adhesively attaching the semiconductor material dies of said semiconductor material layer to a second support;
> while employing said second support to support said wafer, releasing said first support from adhesive attachment to said metal layer and removing said first support from said metal layer to expose the metal layer; and
> while continuing to employ said second support to support said wafer, **cutting said metal layer** along said scribe streets.

MPT has asserted that PT infringes independent claim 1 of the '493 patent. Claim 1 provides (emphasis added):

---

[1] The term "pressurizing" does not appear in Claim 19, instead, in pertinent part, it states the following: **a fluid pressure** differential between **fluid contacting** opposed sides of said sheet of deformable material to deform the sheet of deformable material and break the metal layer at the locations of the scribe streets.

3

> A method of separating semiconductor devices of a semiconductor wafer including back metal on the backside thereof positioned on a planar plastic film, said method comprising the steps of:
> removing the semiconductor material in scribe streets between said semiconductor devices until the back metal is exposed in said scribe streets;
> after removing the semiconductor material from the scribe streets, supporting the plastic film on a support structure having a support surface spaced from and surrounding the semiconductor wafer;
> with the planar plastic film supported on the support surface spaced from and surrounding the semiconductor wafer, at said support structure applying a **variable radial force** to said planar plastic film spaced from and extending completely about the periphery of said semiconductor wafer to radially stretch and tension the planar plastic film in all radial directions in the plane of the planar plastic film;
> controlling the radial stretch and tension of the planar plastic film as a function of a control parameter;
> while maintaining control of the radial stretch and tension of the planar plastic film pressing a stylus against the semiconductor wafer while in engagement with the radially stretched and tensioned planar plastic film to cause the plastic film to further deform and stretch in the immediate region where the stylus presses, causing the back metal in the scribe streets located in said region to separate; and
> moving the stylus across the semiconductor wafer and engaging the radially stretched and tensioned planar plastic film to further deform and stretch different regions of the plastic film and while pressing the stylus against the semiconductor wafer causing the back metal in the scribe streets in said different regions to break and separate.

The parties dispute the construction of three claim terms, one from each of the patents-in-suit: "pressurized fluid contacting" (the '745 patent); "cutting said metal layer" (the '188 patent); and "variable radial force" (the '493 patent).

## II.     LEGAL STANDARD

Claim construction is an issue of law reserved for the district court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *affirmed*, 517 U.S. 370 (1996). To ascertain the meaning of claims, the district court uses three primary sources constituting the intrinsic record: (1) the claims, (2) the specification, and (3) the prosecution history. *Id.* at 979.

Claim construction begins with the language of the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.

Cir. 1996) ("[w]e look to the words of the claims themselves . . . to define the scope of the patented invention."). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention."). The words of a claim generally are given the ordinary and customary meaning they have to persons of ordinary skill in the art in question at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Vitronics*, 90 F.3d at 1582. Moreover, claim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Phillips*, 415 F.3d at 1314-15.

While the language of the claims is the first source for interpretation, "[t]he claims, of course, do not stand alone." *Phillips*, 415 F.3d at 1315. "Rather, they are part of a 'fully integrated written instrument' consisting principally of a specification, of which they are a part." *Id*. (citing *Markman*, 52 F.3d at 978). Accordingly, "claims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman*, 52 F.3d at 979).

The prosecution history is another component of the intrinsic evidence used to supply the proper context for claim construction. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004). The prosecution history is comprised of the complete record of the proceedings before the United States Patent and Trademark Office ("PTO"), including prior art cited during examination. *Phillips*, 415 F.3d at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415

F.3d at 1317. "The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582-83).

In addition to intrinsic evidence, courts may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history." *Markman*, 52 F.3d at 980. Such evidence typically includes dictionaries, treatises, and testimony of the inventor or experts. *Id.* at 980. Extrinsic evidence, however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language," and is appropriate only when the available intrinsic evidence is not dispositive. *Phillips*, 415 F.3d at 1317, 1319.

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The parties agree that a person of ordinary skill in the art of manufacturing semiconductor devices at the time the patents-in-suit were filed (*i.e.*, 2011-2013[2]) would have at least an associate's degree in engineering or science, and would have at least two[3] years of experience in the semiconductor manufacturing industry.

## IV. DISCUSSION

### A. "Pressurizing Fluid Contacting" or "Pressurizing Fluid Contacting Said Sheet Of Deformable Material" (The '745 Patent)

The claim term to be construed in the '745 patent is "pressurizing fluid contacting" and/or "pressurizing fluid contacting said sheet of deformable material." This term appears in independent claim 1, but not in independent claim 19. PT argues that the phrase "pressurizing fluid contacting said sheet of deformable material" should be construed as "applying pressure to a fluid *already* in

---

[2] MPT extends the time to 2014.
[3] MPT does not specify the number of years of experience.

contact with said sheet of deformable material," based upon the claim language and the specification. PT contends that the limitation focuses on the action of "pressurizing" the fluid, and specifies that the fluid being pressurized is "contacting" the sheet of deformable material. As evidence, PT points to MPT's use of the present-tense form of "contacting" which indicates that the fluid is in contact with the deformable material at the time the pressurizing begins. PT maintains that the claim term should be limited to the specific pressurizing step disclosed in the specification because the specification refers to this pressurizing step as part of the "invention," and not merely one exemplary way of carrying out the invention.

MPT argues that PT's proposed construction misconstrues the invention and unnecessarily introduces limitations in the claims that have no bearing on the ordinary meaning of the claim terms and how a person of ordinary skill in the art would understand the invention. MPT contends that there is no support in the specification or the prosecution history for PT's construction that the fluid already be in contact with the sheet of material before pressure is applied. In addition, MPT argues that PT's proposed construction would essentially read dependent claims 3 and 4 into independent claim 1, rendering claims 3 and 4 superfluous. Consequently, MPT contends that PT's proposed construction violates the doctrine of claim differentiation. As a result, MPT alleges that its proposed construction "to apply gaseous or liquid pressure to an object" accurately defines the invention. Doc. 56 p. 7-9.

The Court agrees with PT's proposed construction. Indeed, MPT's proposed construction is overly broad, ignores the plain language of the claim and the specification. For instance, the "Disclosure of Invention" section of the specification indicates that the "*fluid contacting* the sheet of deformable material is pressurized to deform the sheet of deformable material." Doc. 57 Ex. A, col. 2:52-55. Also, the "Mode For Carrying Out The Invention" section of the specification

7

explains that "the portion 36 of the chamber 30 above the plastic film 16 has a *fluid introduced and the pressure of the fluid is raised* until the segments or portions of the plastic film 16 above the etched scribe streets are pressed into the streets." *Id*. col. 3:65-4:1. The specification explains that the fluid is introduced into the chamber 30 and *then* the pressure of the fluid is raised. Moreover, MPT's arguments do not address whether the fluid is pressurized before or after the fluid comes into contact with the sheet of deformable material.

This Court is not persuaded that PT's proposed construction violates the doctrine of claims differentiation. *See Comark Communications, Inc. v. Harris Corp*., 156 F.3d 1182, 1187 (Fed. Cir. 1998)(recognizing "that the doctrine of claim differentiation is not a hard and fast rule of construction, it does create a presumption that each claim in a patent has a different scope."). As noted by PT, dependent claims 3 and 4 simply provide more detail as to how the pressure is applied and how the pressure is increased, but have no bearing on whether the fluid is contacting the deformable material before the pressure is applied. Simply stated, MPT misapplies the doctrine. Accordingly, the Court will construe "pressurizing fluid contacting said sheet of deformable material" to mean "applying pressure to a fluid already in contact with said sheet of deformable material."

### B. "Cutting Said Metal Layer" (the '188 Patent)

The claim term to be construed in the '188 patent is contained in three independent claims (claims 1, 16, and 17) all of which contain the phrase "cutting said metal layer along said scribe streets." PT argues that the phrase "cutting said metal layer" should be construed to mean "shearing the metal layer with a blade." PT asserts that MPT's construction is too broad. Moreover, PT contends that claims 8, 10, 12 and 13 depend from claim 1, and further define the cutting step of claim 1. PT submits that the only embodiments disclosed as part of the purported

invention of the '188 patent use a cutting tool that includes a blade. *See* Ex. B col. 3:55-59; col. 4:5-8. As stated in claim 8, the cutting step includes "aligning a cutting tool" and "moving the cutting tool along each of the scribe streets while penetrating the metal." Ex. B col. 5:45-50. Likewise, claims 10, 12, and 13 further specify the type of blade that is used to perform the cutting. *See id*. col. 5:54-6:9. PT alleges that the existence of these dependent claims, which are specific to cutting with a blade, shows claim 1 is meant to be limited to cutting with a cutting tool that uses a blade. In addition, PT maintains that there is a lack of any dependent claims which specify that the cutting step may include other types of "penetrating, dividing, or removing the metal layer" without a blade, as proposed by MPT's construction. In addition, PT points out that the specification does not mention using a laser, or any other non-blade shearing method in the Disclosure of Invention or Modes for Carrying Out the Invention sections.

MPT argues that although cutting tools with blades are described in the specification, the claims are directed to a method for dividing a semiconductor wafer, not an apparatus for dividing a semiconductor wafer. Moreover, MPT contends that PT's proposed claim construction violates the doctrine of claim differentiation by insisting that the cutting must be performed *by a blade. See InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) ("the doctrine of claim differentiation is at its strongest . . . where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim.") In short, MPT contends that the blade limitation *does not* appear in the independent claim but only in the dependent claims. Consequently, MPT argues that the term "cutting" should be given its plain and ordinary meaning without any limitation as to the *type* of tool used to perform the cutting, and therefore, the terms "penetrating, dividing, or removing the metal layer" are more appropriate.

9

The Court finds that "cutting" recited in claim 1 means shearing with a blade. Indeed, as PT correctly notes, the two embodiments disclosed as part of the invention use a cutting tool that includes a blade. The specification section discloses two separate cutting tools (Figs. 9 and 10) that may be used to perform the cutting process, both of which include blades. *See* Doc. 57 Ex. B col. 4:14-25; *see* Figs 9-10. Further, the Court disagrees that the claim differentiation doctrine is violated. "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips,* 415 F.3d at 1316. Here, PT's proposed construction "stays true to the claim language and most naturally aligns with the patent's description of the invention," *Phillips*, 415 F.3d at 1316. Accordingly, the Court will construe "cutting said metal layer" to mean "shearing the metal layer with a blade."

### C. "Variable Radial Force" (the '493 Patent)

The claim term to be construed in the '493 patent is "variable radial force." This term appears in claim 1 of the '493 patent, which is the only independent claim in the patent. PT argues that the phrase "variable radial force" should be construed to mean "spatially non-uniform radial force." PT contends that MPT seeks an overly broad construction which ignores the specification and the prosecution history. As PT argues, one of ordinary skill in the art of semiconductor singulation would understand the terms "variable radial force" to mean that applying a uniform force in all directions provides inferior results, such that different radial forces must be applied in different radial directions to account for parts of the film that may be sagging in the frame. PT further maintains that both of the embodiments disclosed in the '493 patent support this

interpretation. *See* Doc. 57 Ex. C col. 5:10-13; 6:7-9. In addition, PT contends that the prosecution history of the '493 patent also supports this interpretation.

MPT argues that Plaintiff's proposed construction for variable radial force is confusing and not supported by intrinsic evidence. MPT further maintains that there is nothing in the specification that even remotely explains what "spatially non-uniform" means or connotes. And MPT further points out that during the prosecution of the application that matured into the '493 patent, the terms "spatially non-uniform" were not used and that the Applicant/Patentee consistently used the terms "variable radial force." Thus, MPT maintains that the Court should give the phrase "variable radial force" its ordinary meaning of "a variable force from the center of a circle outward toward the circumference along a radius."

MPT's construction is overly broad and ignores the specification and the prosecution history. Both of the embodiments disclosed in the '493 patent support PT's interpretation. Regarding the first embodiment, the '493 patent explains that a vacuum controller applies different amounts of vacuum force so that "ambient air pressure presses the film into the channel by different amounts." Doc. 57 Ex. C col. 5:10-13. With respect to the second embodiment that uses multiple pneumatic cylinders to press the plastic film at different points around its circumference, the '493 patent further discloses that "[b]y using different quantities of force applied to the force ring 72, precise control of the stretch and tension of the film can be achieved." *Id*. col. 6:7-9. Moreover, the prosecution history of the '493 patent also supports PT's interpretation since even MPT argued that "[w]hen one wishes to control the stretch and tension in the plastic film, simply moving all parts of the film outward a certain distance in a radial direction does not achieve the desired results." Doc. 57 Ex. E pgs. 10-11. Accordingly, the Court will construe "variable radial force" to mean "a spatially non-uniform radial force."

## V. CONCLUSION

The disputed claim terms are hereby **CONSTRUED** as follows:

1. **"pressurizing fluid contacting" / "pressurizing fluid contacting said sheet of deformable material"** means "applying pressure to a fluid already in contact with said sheet of deformable material";

2. **"cutting said metal layer"** means "shearing the metal layer with a blade";

3. **"variable radial force"** means "spatially non-uniform radial force";

   **DONE AND ORDERED** in Tampa, Florida on February 28, 2017.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any